FILED ___ ENTERED
___ LOGGED ___ RECEIVED

DEC 2 0 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH AND SEIZURE OF THE SUBJECT ELECTRONIC DEVICES | Case No. 19-3972 ADC<br><br>**Filed Under Seal** |

I, Special Agent James S Keay, of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, deposes and state as follows:

## BACKGROUND

1. I submit this affidavit to apply for a search and seizure warrant for five cellular telephones and one laptop, listed below and in Attachment A of this Affidavit (herein referred to collectively as the "**Subject Electronic Devices**"). As explained below, these items were seized by the ATF during the execution of a search warrant at 2200 Booth Street, Baltimore MD and during the subsequent arrests of Sterlyn BUTCHER, Tavon CROWDER, and Darrius MARTIN for conspiring to distribute drugs. The **Subject Electronic Devices** to be searched are as follows:

    a. A Black HP Laptop computer, ATF property #000021, recovered from 2200 Booth Street (**Subject Electronic Device 1**)

    b. A Black Apple I-phone touch-screen and any attached SIM or memory card, Model unknown, ATF property number #000022, recovered from 2200 Booth street (**Subject Electronic Device 2**)

    c. A Black Apple I-phone touch-screen with a blue case and any attached SIM or memory card, Model unknown, ATF property number #000025, recovered from CROWDER (**Subject Electronic Device 3**)

    d. A black Samsung cellular phone and any attached SIM or memory card, with a cracked screen, Model unknown, ATF property #000027, recovered from MARTIN (**Subject Electronic Device 4**)

    e. A black Samsung cellular phone and any attached SIM or memory card, serial number 8901260353925403247F, new with box, ATF property #000027, recovered from MARTIN (**Subject Electronic Device 5**)

    f. A black Apple I-phone touch-screen with a black case and any attached SIM or memory card, Model unknown, ATF property number #000028, recovered from

BUTCHER (**Subject Electronic Device 6**)

2. The items to be searched are believed to contain and conceal items that constitute evidence of a violation of 21 U.S.C. §§ 841, 846 (conspiracy to distribute controlled dangerous substances and possession with intent to distribute controlled dangerous substances); 18 U.S.C. § 922(g); and 18 U.S.C. § 924(c). The phones and laptop are currently in the custody of ATF.

3. The applied for warrant would authorize the examination of the **Subject Electronic Devices** for the purpose of identifying electronically stored data particularly described in Attachment B and using the protocols described in Attachment B by members of the ATF, or their authorized representatives, including but not limited to other law enforcement agents assisting in the above described investigation.

## AFFIANT EXPERTISE

4. I am a Special Agent with the ATF, and have been a Special Agent since 2016. I am currently assigned to the ATF Baltimore Field Division, Baltimore Group VI Field Office. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic Training, both located in Glynco, Georgia, for a combined period of twenty-six weeks. I have received extensive training, both formal and on-the-job, in the provisions of the Federal Firearms Laws and Federal Narcotics Laws administered under Title 18, Title 21 and Title 26 of the United States Code. As an ATF agent, I have conducted and participated in investigations concerning violations of federal firearm laws, violations of federal controlled substance laws, and the commission of violent crimes. I have received specialized training regarding, and has personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) undercover operations; (d) the

execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers; (g) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (h) the handling, maintenance, and examination of evidence to include wireless telephones and computers. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

5.      I have participated in numerous investigations targeting violent Drug Trafficking Organizations (DTOs) operating throughout Baltimore City. I have conducted covert surveillance of suspected narcotics traffickers and violent offenders. I have interviewed defendants under investigation by the ATF who have been charged for violation under Title 21. Through my knowledge, training, and experience, I have become familiar with the manner in which illegal narcotics are transported, stored, and distributed, and the manner in which narcotics traffickers communicate with one another. I have participated in several Title III wire-tap investigation.

6.      Based on my training, knowledge and experience as a Special Agent with the ATF, I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the illegal possession and trafficking of firearms. From my training, knowledge, experience, and conversations with other agents and officers, I am familiar with the manner in which illegal firearms are transported, stored, and distributed, and with the methods of payment for such firearms. I am also familiar with the techniques employed by firearms traffickers to keep records of their firearm trafficking activities, to conceal proceeds of their illegal conduct, and to evade law enforcement by utilizing counter-surveillance, false identifications, and multiple

means of communication and transportation.

7. During my tenure with ATF, one of my primary duties has been investigating firearms and narcotics trafficking enterprises. In addition, I have been involved in arrests and interviews of narcotics and firearms traffickers. I have also been involved in wiretap investigations and the execution of search warrants in relation to narcotics and firearms trafficking. As a result, I am familiar with the manner and means of narcotics and firearms trafficking.

8. This investigation is being conducted by the ATF, and the Baltimore City Police Department (BPD). I have personally participated in this investigation and make this affidavit based upon my personal participation in this investigation and based on reports made by other law enforcement agents, as well as confidential informants discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Not all of the facts of the investigation known to me are contained herein, only those necessary to establish probable cause for the stated offense.

9. Through training and experience in drug trafficking investigations and arrests, I have become familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods

of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

10. Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators. In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

11. Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them. I also know the following:

    a. The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity. Cell phones have both digital storage capacity and digital camera capabilities.

    b. Individuals involved in drug trafficking often use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity and sometimes take photographs of themselves and/or co-conspirators.

    c. Individuals who possess or own handguns or other weapons and/or illegal substances frequently photograph themselves holding the handguns or other weapons

and/or illegal substances.

  d. Photographs on a suspect's digital device sometimes show the suspects handling proceeds from drug sales/trafficking or illegal substances.

  e. Individuals who engage in drug trafficking often use cellular telephones to communicate with co-conspirators via phone calls and text messages.

  f. Cell phones often record the phone's historical location data.

12. Based upon my training, experience and participation in this and other drug trafficking investigations, I know that cellular phones and electronic devices belonging to drug traffickers often contain important evidence of their illegal activities. Specifically, I know that they can contain evidence of drug trafficking activities in the following forms: (i) the content of text messages; (ii) phone call logs; (iii) contact lists; (iv) user and account information; (v) information about digital accounts and internet applications used by the phone; (vi) photographs, videos, and other media depicting drug trafficking evidence (e.g. U.S. currency, narcotics, and drug trafficking paraphernalia); (vii) historical location information; and (viii) web activity. *See generally* Attachment B.

## PROBABLE CAUSE

13. In May 2018, ATF initiated an investigation into a violent DTO operating as an open-air drug shop in and around Smallwood Street and Booth Street in southwest Baltimore, Maryland. During the investigation, ATF has positively identified at least a dozen co-conspirators and prior felons, including Frank TANZYMORE, Steryln BUTCHER, Tavon CROWDER, and Darrius MARTIN, who have been responsible for distributing substantial quantities of heroin, cocaine, crack cocaine, and fentanyl.

14. The drug shop operates whereby customers, typically arrive at the shop in cars but

also on foot. They then turn from Smallwood Street on to Booth Street, which effectively serves as a drive-thru lane to place orders of narcotics with co-conspirators congregating nearby.

15. From July 2018 to September 2019, the ATF conducted over a dozen controlled purchases of controlled substances from members of this organization, including TANZYMORE, CROWDER, BUTCHER, and MARTIN. The controlled purchases were not episodes isolated from the conspiracy. Investigators have seen TANZYMORE, CROWDER, BUTCHER and MARTIN interacting with drug customers and co-conspirators throughout the course of this investigation. TANZYMORE, CROWDER, BUTCHER and MARTIN have been captured on video surveillance at the open air shop selling drugs, collecting drug proceeds, exchanging proceeds with drug conspirators, and going in and out of known stash houses.

16. Investigators have also observed, on video surveillance, TANZYMORE, BUTCHER, CROWDER, and MARTIN using their cell phones during the course of these suspected illegal narcotics transactions.

17. On October 16, 2019, law enforcement obtained an indictment charging nine individuals, including TANZYMORE, BUTCHER, CROWDER, and MARTIN, with a conspiracy to distribute 40 grams or more of fentanyl, among other controlled substances, in violation of 21 U.S.C. § 846. On October 17, 2019, the ATF and Baltimore Police Department executed search and arrest warrants subsequent to the indictment. During this takedown, investigators located the following three firearms:

- One (1) AK47 7.62 caliber Assault style rifle (Serial# 017425)
- One (1) GLOCK model 42 .380 caliber semi-automatic pistol (Serial# ABYT525)
- One (1) Keltec model P40 .40 caliber semi-automatic pistol (Serial #72952).

In addition to the above-mentioned firearms, investigators recovered over 100 rounds of

ammunition, consisting of various calibers. The firearms and ammunition were all recovered from a vacant residence in close proximity to the drug shop, which was frequently utilized by members of the DTO as a stash house.

***Subject Electronic Devices 1-2***

18. Over the course of this investigation, ATF has conducted at least seven controlled purchases involving TANZYMORE, typically through the use of a confidential source (CS)[1]. On June 25, 2019, the CS spoke with TANZYMORE during a controlled purchase, and TANZYMORE and the CS exchanged phone numbers in order to facilitate future narcotics purchases.

19. Using this phone number provided by TANZYMORE, the CS contacted TANZYMORE, via text message, prior to controlled purchases to inform TANZYMORE of the type of CDS the CS wished to purchase in advance. For example, on July 2, 2019, ATF conducted a controlled purchase from TANZYMORE utilizing the CS. After the CS and TANZYMORE exchanged greetings, they began to discuss via text the price of an "eight ball." Investigators know that the term "eight ball" commonly refers to approximately 3.5 grams of suspected narcotics. During the controlled purchase, TANZYMORE directed another individual, later determined to be his son, to give the CS 35 vials of suspected crack cocaine for the price of $150.00 dollars.

20. On July 25, 2019, ATF conducted another controlled purchase utilizing the same communication method as previously mentioned above, where the CS contacted TANZYMORE

---

[1] The CS has been an ATF Confidential Source since 2018. The CS has been paid for his/her work with ATF. The information provided by the CS has proved reliable in the past and the information provided by the CS in the instant case has been corroborated to the extent possible and proven reliable. The purchases made by the CS in this case were corroborated law enforcement through physical and video surveillance. The CS has a prior conviction for the unlawful possession of a controlled substance.

and informed him what he wanted to purchase. TANZYMORE advised the CS via text that he had the CDS available and that it would ready when the CS arrived. During this ensuing controlled purchase, TANZYMORE sold the CS 48 glass vials containing cocaine in exchange for $200.

21. As part of the investigation, ATF obtained a federal search warrant for 2200 Booth Street, Baltimore, MD, which was believed to be TANZYMORE's residence. During the course of this investigation, investigators observed TANZYMORE, as well as numerous other suspected members of the DTO, entering the property of the residence just prior to conducting CDS transactions. On numerous occasions, I also have observed co-conspirators walk in the direction of the rear door of the residence, often carrying cash, just before and after dealing drugs as well as at various times throughout the day.

22. The following Google images of the area where the drug shop operates show the proximity of 2200 Booth Street, Tanzymore's residence, to the typical flow of drug customers from Smallwood Street down Booth Street:





23. After securing the residence, a search was then conducted by the agents/officers and the following items were seized from the residence pursuant to the search warrant:

- One (1) black HP Laptop (located in the Kitchen) (**Subject Electronic Device 1**)

- One (1) black cellular iPhone model A1387 and charger (located in the Kitchen) (**Subject Electronic Device 2**)

Additional recovered evidence indicated that TANZYMORE in fact lived at the residence, including various pieces of US mail bearing the name of Frank TANZYMORE Jr (located in upstairs bathroom) and a Maryland Identification Card bearing the name of Frank TANZYMORE Jr (located in upstairs bedroom).

*Subject Electronic Devices 3*

24. Over the course of the investigation, CROWDER was captured on multiple occasions on video surveillance being re-supplied with CDS, counting large amounts of cash, and

selling to buyers.

25. For example, on October 5, 2018 a controlled purchase was conducted whereby the undercover agent (UC) approached the open air shop and requested to buy crack cocaine from a co-conspirator. The co-conspirator approached the UC and instructed him to pull away from the middle of Hollins Street. At that point, the co-conspirator signaled to CROWDER who then retrieved narcotics just out of camera view. CROWDER came back into view and conducted the transaction with the UC. CROWDER was recorded on video handing 25 glass vials of cocaine to the UC for the price of $230.00.

26. October 3, 2019, CROWDER was observed again on video surveillance, this time entering a known stash location, in close proximity to the drug shop, attempting to hide items on the ground and inside of a vacant dwelling being used as a stash house. While under surveillance, ATF notified officers with the Baltimore Police Department, who then arrived at the stash location where CROWDER was last seen, and recovered CDS and a semi-automatic pistol.

***Subject Electronic Device 4-5***

27. During the course of this investigation, ATF also conducted controlled purchases from Darrius MARTIN. Specifically, on August 6, 2019, the CS purchased 9.24 grams of fentanyl in the form of 30 red, white and blue colored gel caps in exchange for $300.00 dollars.

28. On August 23, 2019, ATF conducted another controlled purchase whereby the CS purchased 30 vials of crack cocaine for the price of $150.00 dollars from TANZYMORE. Also during this purchase, an ATF Undercover Special Agent (UC), purchased 50 clear gel caps containing fentanyl for $300.00 dollars. During the course of this purchase, TANZYMORE was counting out the 50 clear gel caps, to provide to the UC when he realized that he only had 46 gel caps and needed 4 more to fulfill the order. TANZYMORE then directed MARTIN to provide

"four more" gel caps, which he did. This controlled purchase resulted in the sale of .9 grams of crack, and 13.5 grams of fentanyl. Additionally, over the course of the investigation MARTIN has also been captured on video surveillance camera bringing packs of suspected CDS to the shop and then distributing suspects CDS to other members. MARTIN was also seen selling to various customers on foot and in vehicles.

29. MARTIN was arrested by the ATF on October 22, 2019 pursuant to an arrest warrant arising out of the federal drug charges. Incident to this arrest agents recovered **Subject Electronic Devices 4 and 5** on MARTIN's person.

*Subject Electronic Device 6*

30. On September 11, 2018, investigators utilized UC1 to conduct a controlled purchase of crack cocaine from BUTCHER in the vicinity of the Smallwood and Booth Streets in Baltimore City, Maryland. During this controlled purchase, UC1 approached Smallwood Street and made contact with BUTCHER near the intersection of Smallwood and West Baltimore Streets. UC1 informed BUTCHER that he/she was interested in purchasing $80 worth of crack cocaine. BUTCHER gave UC1 six (8) vials of crack cocaine (i.e. cocaine base) in exchange for $80. UC1 also purchased $150.00 worth of Heroin from another co-conspirator. The suspected controlled substances were analyzed by the Baltimore Police Laboratory Section and tested positive for cocaine base (crack cocaine) and Fentanyl.

31. During this investigation, investigators obtained pen registers on several co-conspirators' phones. During the course of analyzing the data obtained via those pen registers, investigators identified BUTCHER's phone number as (443) 804-9379. Additional analysis of historical call data indicated that BUTCHER was in constant contact with other co-conspirators who have been identified throughout this investigation.

32. BUTCHER was arrested by the ATF on October 22, 2019 pursuant to an arrest warrant arising out of the federal drug charges. Incident to this arrest agents recovered **Subject Electronic Device 6** on BUTCHER's person.

## THE SUBJECT ELECTRONIC DEVICES

33. As described above, the ATF recovered **Subject Electronic Devices 1-2,** pursuant to the execution of a search warrant on a residence at 2200 Booth Street, Baltimore MD. ATF recovered **Subject Electronic Devices 3-6,** during the arrests of Tavon CROWDER, Sterlyn BUTCHER and Darrius MARTIN by the ATF at the corner of Hollins and Smallwood streets, Baltimore, MD. **Subject Electronic Device 3-6** were located during a search incident to arrest, and were located on the aforementioned persons. Following the arrests, ATF took custody of **Subject Electronic Device 3-6.**

34. I know from experience that drug trafficking is an ongoing and continuous activity that likely does not cease at a particular moment and, as a source of revenue, continues after individual transactions. Accordingly, I believe that TANZYMORE, CROWDER, BUTCHER and MARTIN continued to engage in drug trafficking after the individual controlled purchase and has likely used the **Subject Electronic Device** in furtherance of this activity. Even if TANZYMORE, CROWDER, BUTCHER and MARTIN's drug trafficking ceased shortly after the activity recounted above, the historical evidence of those criminal activities would remain on cellular phones and digital storage devices, to include: call logs, text messages, contacts, pictures, videos, historical location information, and other digital content. *See* Attachment B. I believe this information would likely still be on the cellular phone and laptop computer (**Subject Electronic Device 1-6**).

## CONCLUSION

35.     I submit that the facts recounted above establish probable cause that CROWDER, BUTCHER, MARTIN, and TANZYMORE have committed drug trafficking violations and that possible evidence of these crimes will likely be found in the phones recovered from the arrests and search of 2200 Booth Street.

36.     WHEREFORE, I respectfully request that the Court issue a warrant authorizing members of the ATF, or their authorized representatives, including but not limited to other law enforcement agents assisting in the above described investigation, to search the **Subject Electronic Device 1-6**, as described in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B and using the protocols described in Attachment A.

37.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

_____
Special Agent James S. Keay
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to before me on this 4th day of December, 2019

_____
The Honorable A. David Copperthite
United States Magistrate Judge

## ATTACHMENT A

### Description of the Items to be searched

- **Subject Electronic Device 1:** A Black HP Laptop computer, ATF property #000021 (Recovered from 2200 booth SW)

- **Subject Electronic Device 3:** A Black Apple I-phone touch-screen, Model unknown, ATF property number #000022 and any attached SIM or memory card (Recovered from 2200 booth SW)

- **Subject Electronic Device 3:** A Black Apple I-phone touch-screen with a blue case, Model unknown, ATF property number #000025 and any attached SIM or memory card (Recovered from CROWDER)

- **Subject Electronic Device 4:** A black Samsung cellular phone, with a cracked screen, Model unknown, ATF property #000027 and any attached SIM or memory card (Recovered from MARTIN)

- **Subject Electronic Device 5:** A black Samsung cellular phone, serial number 8901260353925403247F, new with box, ATF property #000027 and any attached SIM or memory card (Recovered from MARTIN)

- **Subject Electronic Device 6:** A black Apple I-phone touch-screen with a black case, Model unknown, ATF property number #000028 and any attached SIM or memory card (Recovered from BUTCHER)

## ATTACHMENT B
### Items to be Seized

All records contained in the items described in Attachment A which constitute evidence of violations of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm; 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute Controlled Substances; and 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Crime, including the following items, as outlined below:

i. Any and all records related to the location of the user(s) of the device.

ii. All of the following:

   a. digital images;

   b. digital videos;

   c. records of incoming and outgoing voice communications;

   d. records of incoming and outgoing text messages;

   e. the content of incoming and outgoing text messages;

   f. voicemails;

   g. voice recordings;

   h. contact lists; and

   i. location data;

   j. evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   k. evidence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   l. evidence of the lack of such malicious software;

   m. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

   n. evidence of counter forensic programs (and associated data) that are designed to

        eliminate data from the devices;

    o. evidence of the times the devices were used;

    p. passwords, encryption keys, and other access devices that may be necessary to access the devices;

    q. documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

    r. contextual information necessary to understand the evidence described in this attachment.

iii. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c. "scanning" storage areas to discover and possible recover recently deleted files;

    d. "scanning"  storage areas for deliberately hidden files; or

    e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation

iv. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.